Denise ANSICK, Plaintiff,

v.

HILLENBRAND INDUSTRIES, INC.; John Hillenbrand and Joan Hillenbrand, individually and as husband and wife; and Daniel Hillenbrand; Defendants.

No. IP95–0207C–B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 26, 1996.

Heidi L. Moegerle, Cohen & Morelock, Indianapolis, Indiana, for Plaintiff.

John M. Choplin, Norris Choplin & Schroeder, George E. Purdy, Bose McKinney & Evans, Indianapolis, Indiana, for Defendants.

## ENTRY

BARKER, Chief Judge.

Plaintiff Denise Ansick was injured when she was thrown from a horse while attending a party hosted by John and Joan Hillenbrand at Jawacdah Farm on May 29, 1993. Defendants Hillenbrand Industries and John, Joan and Daniel Hillenbrand have filed motions for summary judgment and motions to strike the affidavit of Julie Draper, which has been offered in support of plaintiff's response to defendants' motions for summary judgment. For the reasons discussed below, the motions to strike are **GRANTED** and the motions for summary judgment are **GRANTED**.

## I.  BACKGROUND

Jawacdah Farm ("the farm") is a recreational facility owned by defendant Hillenbrand Industries.[1] The farm is used as a conference center by Hillenbrand Industries for the entertainment of customers and for corporate seminars. (H.I. Interrogatory Ans. No. 10). Hillenbrand Industries has given limited permission for a few people to board horses at stables located at the farm. Gus Litmer, a maintenance man employed by Hillenbrand Industries for over eighteen years, is responsible for daily care of the horses boarded there, including watering and feeding the horses and maintaining the stables. (Litmer Aff., ¶¶ 2,4; H.I. Interrogatory Ans. No. 11). Hillenbrand Industries does not, however, own any of the horses

---

1. In May, 1993, John Hillenbrand was a board member of Hillenbrand Industries, but neither he nor Joan nor Dan Hillenbrand were employees or agents of Hillenbrand Industries. (Brink-moeller Aff., ¶ 18; John H. Interrogatory Ans. No. 1; Joan H. Interrogatory Ans. No. 4; Dan H. Interrogatory Ans. Nos. 4, 6).

boarded at the farm; its employees and customers are not allowed to ride the horses; and it does not promote, advertise or conduct horse-related activities. (Brinkmoeller Aff., ¶ 8; Nobbe Aff., ¶ 10; H.I. Interrogatory Ans. No. 11). Hillenbrand Industries is not responsible for training the horses, saddling or bridling the horses, or supervising horse-riding activities. (H.I. Interrogatory Ans. No. 15). Hillenbrand Industries does not control who rides horses boarded at the farm; riders must obtain permission to ride from the horse-owners. (Brinkmoeller Aff., ¶¶ 12–13; Nobbe Aff., ¶¶ 15–16; Litmer Aff., ¶¶ 7–8).

In May, 1993, ten horses were boarded at the farm, including six horses owned by Larry Kennedy. (Litmer Dep., at 27). Members of the Hillenbrand family and their guests, when accompanied by a Hillenbrand family member, had permission to ride horses owned by Larry Kennedy. (Kennedy Dep., at 12, 24; Litmer Dep., at 15, 24; Dan H. Aff., at ¶ 12). Brownie, the horse involved in the incident which gave rise to this lawsuit, was owned by Kennedy, and was boarded at the farm from approximately 1983 to 1995, when he and four of Kennedy's other horses were sold at an auction. (Kennedy Aff., ¶ 5; Litmer Dep., at 28). For the entire time he has been boarded at the farm, Brownie has been blind in his left eye. (Litmer Dep., at 73).

Members of the Hillenbrand family are permitted to reserve Jawacdah Farm for private family gatherings and are allowed to invite guests to these gatherings. (Brinkmoeller Dep., at 33–34). These private family events are not sponsored, hosted, conducted, or controlled by Hillenbrand Industries, and Hillenbrand Industries exercises no control over who is invited to these family gatherings. (Brinkmoeller Aff., ¶ 7; Nobbe Aff., ¶ 8; John H. Interrogatory Ans. No. 9). However, when members of the Hillenbrand family reserve the farm for private use, Hillenbrand Industries provides meals, beverages, housekeeping and security services; and provides detailed rules for the family's use of the farm. (Brinkmoeller Dep., at 53; H.I. Exh. E).

On Memorial Day weekend, May 29–31, 1993, defendants John and Joan Hillenbrand reserved the farm for a private, pre-Indianapolis 500 party. They invited their son, Dan Hillenbrand, to the party, and gave him permission to invite guests. Dan invited his college friend, Tim Martin. Martin, with Dan's permission, invited his girlfriend, plaintiff Denise Ansick, a professional ice skater, and two of her fellow Ice Capades skaters, Dory and Cindy. (Ansick Interrogatory Ans. No. 6; Dan H. Dep., at 41–43).

Martin, Ansick, Dory and Cindy arrived at the farm Saturday evening, May 29. At some point during the party, Martin, who had gone horseback riding on his previous visit to the farm in 1988, asked Dan if they could go riding, and Dan said that they could go later. (Martin Dep., at 47, 52–53, 93). At approximately 11:00–11:30 p.m. that evening, Dan, Cindy, Martin and Ansick went to the stable. (Martin Dep., at 95). On the way to the stable, Dan decided that it would be best if they rode double, since both he and Martin were experienced riders and he wasn't sure how comfortable Ansick and Cindy were on horses. (Dan H., Dep at 57). Once at the stable, Dan selected two horses, and he and Martin saddled and bridled the horses. (Dan H. Dep., at 62–67; Martin Dep., at 102). Dan and Cindy mounted their horse without incident, but when Martin tried to mount, Brownie stepped away from him twice before he was able to successfully mount. (Martin Dep., at 109–111). Although Dan thought this was normal behavior for a horse (Dan H. Dep., at 70–71), Martin thought Brownie seemed a bit "skittish", and decided to take him out for a short run and walk to make sure Brownie was calm and safe before having Ansick mount. (Martin Dep., at 95; Ansick Dep., at 83–84). After running Brownie for approximately five minutes, Martin was satisfied that Brownie was calmed down and safe to ride, and returned to the stable area where Ansick was waiting. (Martin Dep., at 115–16). According to Ansick and Martin, as soon as Ansick hit the saddle, Brownie bucked, stood up on its hind legs, and then fell over backwards. (Martin Dep., at 125;

Ansick Aff., ¶ 7).[2] Ansick fell to the ground and fractured her right elbow. (Ansick Dep., at 125). Because of these injures, Ansick claims that she can no longer work as a professional ice skater. (Ansick Dep., at 139; Ladd Dep., at 40). Ansick has brought this lawsuit against Hillenbrand Industries and John, Joan and Dan Hillenbrand, claiming that they breached their duty of care towards her by negligently permitting her to ride Brownie, a horse she alleges was "known to have temperamental, vicious and/or dangerous propensities." (Complaint, at ¶ 14).

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Fed.R.Civ.Pro.* 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. *Methodist Medical Center v. American Medical Sec., Inc.,* 38 F.3d 316, 319 (7th Cir. 1994). In considering a summary judgment motion, a court must draw all justifiable inferences in the light most favorable to the opposing party, and must resolve any doubt against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991); *Becker v. Tenenbaum–Hill Associates, Inc.,* 914 F.2d 107, 110 (7th Cir.1990). While the burden rests squarely on the party moving for summary judgment to show "that there is an absence of evidence to support the nonmoving party's case", *Celo-*

tex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the nonmoving party may not simply rest on the pleadings, but must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1302 (7th Cir.1991); *Bratton v. Roadway Package System, Inc.,* 77 F.3d 168, 173 (7th Cir.1996). Conclusory allegations by a party opposing a motion for summary judgment cannot defeat the motion. *Smith v. Shawnee Library System,* 60 F.3d 317, 320 (7th Cir.1995). "The moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. If doubts remain, however, as to the existence of a material fact, then those doubts should be resolved in favor of the nonmoving party and summary judgment denied. *See, Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989).

## III. ANALYSIS

Defendants John, Joan and Daniel Hillenbrand, and Hillenbrand Industries argue that summary judgment is appropriate both because Ansick has failed to demonstrate that Brownie possessed temperamental, vicious or dangerous tendencies, or that the defendants knew of any such tendencies; and because Ansick incurred the risk of her injuries. In addition to these two arguments, Hillenbrand Industries also argues that it is entitled to summary judgment because it is immune from liability under the Indiana Recreational Use Statute, because it was not in possession or control of the farm or of Brownie at the time Ansick was injured, and because Ansick was not an invitee of Hillenbrand Industries to whom it owed a duty of care.

---

2. Dan gives a slightly different version of the incident, claiming that Brownie "kind of fell back on its haunches a little bit and was literally kind of spun around and just kind of rolled over." (Dan H. Dep., at 82). There is also a slight disagreement regarding what happened when Ansick first attempted to mount Brownie. Both Dan and Martin state that the first time Ansick attempted to mount, Brownie stepped away as he had done when Martin first attempted to mount. (Dan H. Dep., at 78; Martin Dep., at 122). Ansick, on the other hand, states that she only made one attempt to mount, and there were no attempts made when Brownie stepped away from her. (Ansick Dep., at 121). Neither of these factual disputes is material.

### A. Duty to warn of animal's dangerous tendencies.

Under Indiana law, to establish a prima facie case of negligence, Ansick must "present admissible evidence that [defendants] owed [Ansick] a duty, that the duty was breached, and that the breach proximately caused [her] injury." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 294 (7th Cir. 1996), *quoting, Dickison v. Hargitt*, 611 N.E.2d 691 694 (Ind.App.1993).

An owner or possessor of land owes an invitee a duty to exercise reasonable care for her protection while she is on the landowner's premises. *Ross v. Lowe,* 619 N.E.2d 911, 915 (Ind.1993).[3] "The duty extends not only to harm caused by a condition of the land, but also to activities being conducted on the land, such as maintaining a domestic animal." *Id., citing, Martin v. Shea,* 463 N.E.2d 1092, 1094–96 (Ind.1984). Horses are domestic animals, and the owner of a domestic animal (or in this case, the owner or possessor of land on which the animal is kept) is not liable for injuries caused by the animal unless the animal had dangerous propensities which were known, or by the exercise of reasonable care should have been known, to the owner. *Thornhill v. Deka–Di Riding Stables,* 643 N.E.2d 983, 987 (Ind.App.1994), *citing, Forrest v. Gilley,* 570 N.E.2d 934, 935 (Ind.App.1991), *transfer denied; Williams v. Pohlman,* 257 N.E.2d 329, 331 (Ind.App.1970).[4]

Thus, the central issue is whether defendants knew or should have known that Brownie had dangerous propensities. A dangerous propensity is a "tendency of the animal to do any act which might endanger the safety of persons or property in a given situation." *Ross,* 619 N.E.2d at 914; *Forrest,* 570 N.E.2d at 935. Examples given of the type of dangerous propensities required

to be shown in a case of a plaintiff's fall from a horse include: bucking, rearing, awkwardness, skittishness. *Id.,* at 936.

Plaintiff has presented no evidence whatsoever that Brownie has ever exhibited temperamental, vicious or dangerous behavior or propensities. In fact, all the evidence of Brownie's track record, provided by people who have had long-term personal experience riding and caring for Brownie, shows that Brownie has always been a very gentle horse and had never displayed temperamental, vicious or dangerous behavior. Larry Kennedy, who had owned Brownie for ten years prior to Ansick's injury, states in his affidavit that he has never seen Brownie display temperamental, vicious or dangerous behavior towards anyone; has never seen Brownie buck, rear, or respond skittishly; and has never been advised of such behavior. (Kennedy Aff. ¶¶ 4, 8–10). John Hillenbrand, who has ridden and watched others ride at the farm for over twenty years, states that he has never seen Brownie display temperamental, vicious or dangerous behavior, buck, rear or respond skittishly. (John H. Aff. ¶ 9) Similarly, both Joan and Dan Hillenbrand state that they have never seen or been notified of such behavior in Brownie. (Joan H. Aff. ¶¶ 9–10; Dan H. Aff. ¶¶ 10–11). In fact, Joan Hillenbrand states that she frequently selected Brownie as the horse for her young grandchildren to ride because he is so gentle, tame and easy to ride. (Joan H. Aff. ¶ 8–10).

Ansick offers nothing to contradict defendants strong evidence that Brownie had always been a very gentle horse, had never exhibited any temperamental or dangerous tendencies, and specifically, had never bucked, reared or responded skittishly. Instead, Ansick points to the fact that Brownie was blind in his left eye as evidence that he had temperamental or dangerous tendencies

---

**3.** As a social guest, Ansick was an invitee, and was thus entitled to a duty of reasonable care from the owners/possessors of the farm. *Burrell v. Meads*, 569 N.E.2d 637 (Ind.1991).

**4.** For similar treatment of this issue in other jurisdictions, see, *Landes v. H.E. Farms, Inc.*, 169 A.D.2d 446, 447, 564 N.Y.S.2d 151 (1991) ("owner of a domestic animal is not liable for injury caused by such an animal unless he knows or

should have known of its vicious propensities."); *Appel v. Charles Heinsohn, Inc.*, 91 A.D.2d 1029, 1030, 458 N.Y.S.2d 619 (1983) (plaintiff failed to come forward with any evidentiary proof that the horse that she was riding had ever manifested vicious propensities, and thus she failed to establish that she could make out a prima facie case of negligence at a trial).

of which she should have been warned. Both she and Martin have stated that had they known Brownie was blind in his left eye, they would not have ridden him. (Martin Aff. ¶ 18; Ansick Aff. ¶¶ 14–15). It is uncontested that Brownie was blind in his left eye, that Dan Hillenbrand and Gus Litmer (and presumably John and Joan Hillenbrand) knew of this, and that no-one told Ansick or Martin of Brownie's partial blindness.

▮ We do not believe that the condition of being blind in the left eye is, in and of itself, a dangerous or temperamental tendency which can give rise to liability on the part of defendants. Ansick must go one step further and provide evidence linking Brownie's partial blindness to a dangerous propensity. She attempts to do so when, citing Gus Litmer's deposition testimony, Ansick states that, because of his partial blindness, Brownie was "one of the horses maintained on the farm that frequently displayed temper and would run away", and was scared of other horses. (See, Plaintiff's Brief in Opposition to John, Joan and Daniel Hillenbrand's Motion for Summary Judgment, at 19.)[5] This is a mischaracterization of Litmer's actual deposition testimony, in which he states that, while Brownie normally got along well with the other horses, because he was gentler and more cautious, at feeding time he would often get pushed aside or run away from the other horses. (Litmer Dep., at 71–72). Litmer also states that of all the horses at the farm, Brownie was "the number one", as far as being tame and friendly (Litmer Dep., at 55); that Brownie was not easily spooked by unfamiliar people (*Id.*, at 57); and that he had never seen or been told of any instance in which Brownie bucked a rider or acted in anything other than a tame and friendly manner. (*Id.*, at 42, 56).

The only other evidence Ansick presents in support of her argument that because Brownie was blind in his left eye, he had temperamental or dangerous tendencies of which defendants knew or should have known, is the "expert" affidavit of Julie Draper, which defendants have moved to strike.

*B. Motion to Strike Affidavit of Julie Draper.*

Defendants move to strike the Draper affidavit on the grounds that the opinions offered therein are untimely, due to Ansick's failure to provide the information required by Fed.R.Civ.P. 26(a)(2)(B) prior to their submission of the Draper affidavit in response to defendants' motions for summary judgment. Pursuant to the Case Management Plan entered into in this case, as modified on October 19, 1995, plaintiff was required to disclose the name, address and vita of all non-medical expert witnesses, and to provide the report required by the Fed. R.Civ.P. 26(a)(2)(B), on or before November 30, 1995. (Case Management Plan, V(E)). Rule 26(a)(2)(B) requires the submission of a report containing:

> "a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; . . . the qualifications of the witness . . ."

Fed.R.Civ.P. 26(a)(2)(B). On or about November 30, 1995, Ansick made the following disclosure with respect to her expert on the issue of liability:

> Horse and Horseback Riding Expert
> Vince and/or Julie Draper
> Route 1, Box 502B
> Benton, MO 63736

> At this time, these experts have not been retained or paid a fee on behalf of the Plaintiff. These experts will be retained only if deemed necessary to respond to the anticipated summary judgment motions.

(Plaintiff's Disclosure of Non–Medical Experts, H.I. Exh. B). Ansick did not at any time supplement the above-quoted expert disclosure or provide defendants with any information regarding Draper's anticipated testimony or qualifications, as required by Rule 26.

Ansick responds that her failure to provide the required information was due in part to

---

**5.** Plaintiff has not numbered the pages of her opposition brief. We have assigned page numbers for the purposes of citation, the caption page being page number one.

the fact that defendants did not disclose the identity of the horse or the fact that the horse was blind in his left eye, until after the deadline for filing expert witness disclosures. Ansick states that she did not expect to require Draper's expert testimony until she first learned, from Gus Litmer's January 10, 1996 deposition testimony, that Brownie was blind in his left eye.

■ Defendants may have been prejudiced to some degree by Ansick's failure to disclose the required expert information prior to filing the Draper affidavit, insofar as they filed their motions for summary judgment without the opportunity to review Draper's opinions and without having taken Draper's deposition. Because Ansick failed to comply with the disclosure requirements of the Case Management Plan and Rule 26(a)(2)(B), it is within this court's discretion to strike Draper's affidavit. *Zarecki v. National RR. Passenger Corp.*, 914 F.Supp. 1566, 1573 (N.D.Ill.1996). However, because Ansick was not aware of Brownie's partial blindness until January 10, 1996—less than a week before John, Joan and Dan Hillenbrand filed their summary judgment motion on January 16, 1996, and after Hillenbrand Industries filed its motion on December 21, 1995— we do not think that Ansick's admittedly deficient disclosure should be sanctioned by striking the Draper affidavit. However, even though we have rejected defendants' reasoning for striking Draper's affidavit, we nonetheless grant their motion to strike on other grounds, namely the inadmissibility of Draper's affidavit as either expert or lay testimony under the Federal Rules of Evidence.

## C.  Admissibility of Draper Affidavit

Because Draper's testimony is being offered as expert testimony, we also look to Rule 702 of the Federal Rules of Evidence to determine the admissibility of Draper's affidavit as expert opinion testimony. *See, Zarecki.*, 914 F.Supp. at 1573.[6]

■ Testimony proffered in an expert affidavit must be given by someone able to render an expert opinion based upon scientific knowledge of the subject, and the opinions must assist the trier of fact to understand or determine a fact in issue. Federal Rule of Evidence ("FRE") 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993).[7] Draper's affidavit fails to establish that she is someone able to render an expert opinion on the behavioral propensities of horses that are blind in one eye, specifically the left eye.  In an effort to establish her expert qualifications, Draper states that she has 25 years experience riding horses, 15 years experience boarding horses, 10 years experience training horses, and 5 years experience riding horses competitively;  and then states in a conclusory fashion, "I am an expert regarding the care and training of American Quarter Horses".  (Draper Aff., ¶¶ 2–6).  Draper does not state what, if any, experience she has had with horses that are partially blind, or what, if any, training, education, or other form of credentials she has with regard to horse training.  Perhaps most importantly, Draper admittedly has no experience or familiarity with—indeed, she has never even seen— Brownie, the very horse whose behavioral tendencies she purports to establish with her opinions.  Thus, we have serious questions about Draper's qualifications as an expert.[8]

---

**6.**  Rule 702 states:

  If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of opinion or otherwise.

**7.**  The Third Circuit has recently described the requirements of Rule 702 and *Daubert* as follows:

  (1) the proffered witness must be an expert;
  (2) the expert must testify about matters requiring scientific, technical or specialized

knowledge;  and (3) the expert's testimony must assist the trier of fact.
  *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 781 (3rd Cir.1996).

**8.**  Incredibly, despite having included Draper in her "non-medical expert" disclosure, and despite Draper's statement that she is an expert, Ansick now argues that Draper is a lay witness.  Even if Draper were a lay witness, the opinions and conclusions offered in her affidavit would be inadmissible because they are not based upon personal knowledge or perception.  FRE 602, 701;  *Arnett v. Tuthill Corp., Fill–Rite Div.*, 849 F.Supp. 654, 662 (N.D.Ind.1994).  *See, U.S. v.*

Even if Ansick had established Draper's qualifications as an expert, the opinions and conclusions contained in her affidavit are stark generalizations about horses that are blind in one eye—something about which Draper has failed to establish her knowledge or experience. Draper's affidavit sets forth no foundation for its conclusions. (*See, Navarro v. Fuji Heavy Industries, Ltd.*, 925 F.Supp. 1323, 1328 at n. 3) ("... for purposes of an affidavit at summary judgment, an expert must present only conclusions shown to arise out of a reasoning process based on a firm foundation.") Furthermore, Draper's affidavit provides nothing which might explain why this particular horse, which had never before displayed dangerous or skittish behavior and had never reared or bucked, acted as it did on May 29, 1993. Therefore, for the reasons discussed above, defendants' motions to strike the affidavit of Julie Draper are **GRANTED**.

Finally, even if we were to consider Draper's affidavit, it provides nothing whatsoever to contradict the overwhelming evidence that defendants had never seen or heard of any temperamental or dangerous behavior on the part of Brownie. To survive summary judgment, Ansick must show that defendants knew or should have known of any dangerous behavioral tendencies caused by Brownie's partial blindness. Even with the benefit of Draper's affidavit testimony, Ansick has failed utterly in this regard. The evidence shows that defendants had every reason to believe, based upon their personal experience and observation of Brownie, that Brownie was a particularly tame and gentle horse. Therefore, because plaintiff has failed to demonstrate a genuine issue of fact with regard to an essential element of her case, we GRANT defendants' motions for summary judgment.

Because defendants' motions for summary judgment are resolved by our finding that plaintiff has failed to show that defendants knew or should have known that Brownie had temperamental or dangerous tendencies, we need not address the other arguments advanced by defendants in support of their motions for summary judgment.

## IV. CONCLUSION

For the reasons discussed above, defendants' motions to strike the affidavit of Julie Draper are granted and defendants' motions for summary judgment are also granted.

It is so ORDERED.

*Williams*, 81 F.3d 1434, 1441 (7th Cir.1996) ("The difference between an expert witness and an ordinary witness is that the former is allowed to offer an opinion, while the latter is confined to testifying from personal knowledge.").